UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DARLENE TRAFTON, )<br>)<br>            Plaintiff, )<br>)<br>v. )<br>)<br>SUNBURY PRIMARY CARE PA, )<br>)<br>            Defendant. ) | Case No. 1:08-cv-322-JAW |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Darlene Trafton sued her former employer, Sunbury Primary Care PA, alleging disability discrimination under the Americans with Disabilities Act and the Maine Human Rights Act. Ms. Trafton has a history of depression and stress associated with traumatic events she experienced in her life. The record reflects that Trafton is very capable and competent and has overcome these challenges, but that her response to stressors in the workplace undermined her working relationship with clinical personnel in the office. When a member of the clinical staff tendered her resignation based on this tense relationship, the supervisor in charge chose to terminate Trafton in order to retain the clinician. According to Trafton, critical comments about her emotional health were made. She maintains that she was let go because of discriminatory attitudes about people with significant mental health histories. The supervisor denies knowledge of Trafton's history and denies regarding Trafton as disabled. Now pending is Sunbury's motion for summary judgment. The Court referred the motion for report and recommendation and I recommend that the Court grant the motion as to the federal claim arising under the Americans with Disabilities Act because Trafton's evidence does not support a non-speculative finding concerning her supervisor's alleged perception of her as someone substantially limited in the

major life activities of working and caring for herself or of her supervisor's alleged knowledge of any mental health history related to a time when Trafton may have been substantially limited on a temporary basis. Because the threshold for liability under the Maine Human Rights Act is appreciably lower, I recommend that the Court remand Trafton's discrimination claim under that statute. As a consequence of this recommendation, I have withheld ruling on two motions to exclude expert testimony, also referred by the Court.

I.      **Summary Judgment Standard**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

The following factual statement is drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me.

2

2004); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004). As required, the factual grounds for Trafton's suit are cast in the light most flattering to her cause.

## II. Summary Judgment Facts

Sunbury Primary Care, P.A. (Sunbury) is an organization of healthcare providers consisting of seven separate family practice medical offices in the Bangor, Maine area. (Def.'s Statement of Material Facts (DSMF) ¶ 5, Doc. No. 21.) Sunbury hired Darlene Trafton, née Atwater,[1] in October 2005 for the position of Front Office Manager and she started work on October 28, 2005. (Id. ¶ 6; Pl.'s Statement of Additional Material Facts (PSAMF) ¶ 4, Doc. No. 34.) Sunbury's Chief Executive Officer, David Savell, was Trafton's supervisor. (DSMF ¶ 8.) Trafton's initial job assignment was to move Sunbury's Riverview medical office from its location in Brewer, Maine, to Sunbury's existing medical office in Hampden, Maine. The Riverview office would temporarily share space with Sunbury's Hampden office until completion of construction of a new office in Bangor, Maine. (Id. ¶ 12.) The move from Brewer to Hampden occurred on or about December 5, 2005. (Id. ¶ 13.) Prior to the move, Trafton shed tears on the job when Savell scolded her for leaving to help a patient during Savell's meeting with staff. (Id. ¶ 25.) Trafton also shed tears on the job on December 5, 2005, based on criticism voiced by another employee, Roberta Klimaszewski. (Id. ¶ 24.) According to Trafton's testimony, Savell stated to Trafton on December 7, 2005, that he thought the job was too much for her and that she could not handle it because she was "unstable." At another meeting with Trafton, Savell stated: "now don't go out and burn the building down." (Id. ¶ 54.) Trafton admits that she does not recall the purpose of the meeting or the context of Savell's comment.

---

[1] Trafton acquired her married name in 2006. She was Darlene Atwater during her employment with Sunbury.

(Pl.'s Opposing Statement of Material Facts (POSMF) ¶ 30, Doc. No. 34.)  She says she asked Savell what he meant and that he responded, "Well, you do tend to get out of control."  (Id. ¶ 31.)  Despite these incidents, Savell did not exclusively criticize Trafton.  It is undisputed that, on December 16, 2005, Savell wrote an e-mail to Trafton in which he stated that she was "truly doing exactly what needs to be done" and encouraged her to keep in mind that she was "carrying a heavy load for ultimately the flagship division at Sunbury Primary Care."  (Id. ¶ 26.)

    The Riverview practice remained at Sunbury's Hampden office for approximately one month and then moved to the finished facility in Bangor on or about January 5, 2006.  (Id. ¶ 15.)  Upon moving to the Bangor facility, the Riverview practice was redubbed Bangor Family Medicine.  (Id. ¶ 16.)  Trafton's duties as Front Office Manager at Bangor Family Medicine included, but were not limited to, coordinating work activities and schedules within the office, supervising and evaluating front office staff, insuring that the office was adequately supplied, maintaining patient and employee confidentiality, greeting patients and visitors promptly and professionally, scheduling patient visits, checking in patients, and updating patient information.  (Id. ¶ 18.)

    The back-office analogue to Trafton's Front Office Manager position is the Clinical Coordinator position.  During the time that the Riverview division shared space with Hampden Family Medicine, the Riverview practice had only one provider, Cathy Bouton-Semell, PA-C, and no clinical coordinator.  (PSAMF ¶ 15.)  Mr. Savell asked Trafton to "keep an eye on" the clinical side of the Riverview practice in the absence of a dedicated clinical coordinator.  (Id. ¶ 16.)  When the practice moved to Bangor, Sunbury hired Brenda Wood to serve as its Clinical Coordinator.  (PSAMF ¶¶ 18-19.)  Like Trafton, Ms. Wood was supervised by Mr. Savell and the two were regarded as coequals in terms of level of authority and supervisory capacity over

4

the respective front-office and back-office staff. (DSMF ¶ 20.) Trafton says that Savell never told her to stop "keeping an eye" on the clinical side after Sunbury hired Wood. She also says that Dr. Bruehl asked her to look over the clinical side because "mistakes were being made." (PSAMF ¶ 71.) Ms. Wood was supervised by Dr. Bruehl, who transferred to Bangor Family Medicine from Orono Family Medicine, as well as by Savell. (PSAMF ¶ 17.) Dr. Bruehl's involvement with Trafton does not appear to have been significant. Trafton states that on one occasion, the date of which is not stated, Dr. Bruehl informed Trafton that Savell had told him about her "breakdowns." (PSAMF ¶ 56; POSMF ¶¶ 32, 35.)

The working relationship between Trafton and Wood was not good. Trafton states that she was inclined to help out wherever she was needed, including in the back office, even after Wood took on as Clinical Coordinator, citing her own declaration to that effect. (Id. ¶ 22.) According to Sunbury, some employees (at least Wood and Lynett Roy) regarded Trafton's help as interfering, citing testimony from Savell and Wood. (Def.'s Reply Statement ¶ 22, Doc. No. 52.) According to Trafton, the clinical side made numerous mistakes including failing to call back patients or call-in prescriptions in a timely manner, and failed to maintain patient flow. (PSAMF ¶ 24.) This is supported by Trafton's own deposition testimony.[2] (Id.) However, Trafton's deposition testimony acknowledges the existence of tension between the front office and the clinical side of the office and, in particular, between Trafton and Wood. (DSMF ¶¶ 39-45; Pl.'s Opposing Statement ¶¶ 39-43, 45; Trafton Dep. at 235-242; Trafton Dep. Ex. 15, Doc. No. 21-18.)

---

[2] Trafton's additional citation to Dr. Bruehl's deposition transcript is not helpful. Trafton's citations to "Pl. Dep. Exh. 6, 8, 20" are mysteries. Sunbury attached documents to its statement that bear those identifiers, but they do not support the statement offered by Trafton and I find no other documents of the description attached to Trafton's opposition memorandum.

5

According to Trafton, Savell denied a request she made for leave on account of stress and exhaustion in January 2006, making "a comment that implied that Trafton was weak." (PSAMF ¶ 58.)

During the course of her employment with Sunbury, Trafton treated with a Sunbury physician, Dr. Jennifer Trimble, D.O., of the Hampden Family Medicine office, between January 6 and March 6 of 2006. (Id. ¶ 40.) Chronologically, this means that Trafton first visited with Dr. Trimble in Hampden immediately after the transition of the former Riverview practice to Bangor. Dr. Trimble started Trafton on Wellbutrin following her first visit on January 6, 2006, because Trafton complained of insomnia and fatigue and she reported a history of depression, including two past suicide attempts. (Id. ¶¶ 29, 42.) Dr. Trimble added a short course of Ambien a few days later, during a follow-up visit, when she learned more information about Trafton's underlying condition and came to feel "pretty confident in the diagnoses." (Id. ¶ 43; Dr. Trimble Dep. at 30, Doc. No. 21-27; Trimble Decl. ¶¶ 2-5, Doc. No. 34-8.) Dr. Trimble continued the Wellbutrin prescription in February based on Trafton's report of the same conditions of insomnia and fatigue. (PSAMF ¶¶ 67-68.) In regard to Trafton's mental health, Trafton had received diagnoses of depression and post-traumatic stress disorder in the past. Dr. Trimble concurs in these diagnoses based on interviews with Trafton and considers Trafton's stress and insomnia to be related to an underlying disorder.[3] (Id. ¶ 43.)

On February 24, 2006, Savell sent Trafton an e-mail in which he thanked her "for all that [she had] provided with respect to organizing and managing the front office area for Bangor

---

[3] Dr. Trimble's opinion about Trafton's mental health condition is subject to a motion to exclude, but Dr. Trimble's professional opinion is not material to the pending motion for summary judgment against Trafton's ADA claim. The material issue is whether Savell was privy to Dr. Trimble's treatment notes.

Family Medicine." (Id. ¶ 27.) At his deposition, Savell testified: "I thought then and I believe today that she's a very intelligent young lady and a hard worker." (Id. ¶ 28-A.) During her employment with Sunbury, Trafton never received any warnings or progressive discipline[4] for her work performance, though both parties relate that critical comments were made. (Id. ¶ 28.) Sunbury cites deposition testimony from Savell to the effect that he told Trafton to work on improving the work relationship with Wood. (Reply Statement ¶ 28.) Trafton relates that Savell was critical of her emotional response to stress in the workplace and made comments about her "instability" and "emotional state" if she was tearful or "choked up." (POSMF ¶ 22.) Trafton testified at her deposition that she cried in the office six times, "maybe less," and usually in connection with meetings with Savell. (DSMF ¶ 23; Trafton Dep. at 282-83.) She also testified that Savell's alleged comments about her "instability" or "emotional state" were made at these times. (DSMF ¶ 22; Trafton Dep. at 210.) Savell also communicated with Dr. Bruehl about Trafton, including some reference to Trafton's "meltdowns" or "breakdowns." (PSAMF ¶ 56.) During her deposition, Trafton recounted a handful of incidents to explain the crying episodes, explaining the appreciable stressors existing in the office, and including at least one specific rebuke by Savell concerning office conduct. (DSMF ¶¶ 24-26.) During a discussion that took place in February, Trafton told Savell to stop commenting that she was "unstable." (Id. ¶ 60; Trafton Dep. at 206-207.) Following this discussion, Savell communicated with Trafton to a reduced degree. (PSAMF ¶ 61; Trafton Dep. at 207:15-20.)

At the end of February or the very beginning of March, Medical Assistant Lynett Roy, who worked under Brenda Wood, tendered her resignation to Sunbury. Sunbury states that Roy

---

[4] Trafton has not produced evidence of a progressive discipline policy.

7

tendered her resignation based on Trafton's treatment of her and Brenda Wood. (DSMF ¶¶ 46, 56.) Ms. Roy has executed an affidavit for Sunbury in which she attests that she tendered her resignation because of Trafton's "rude and divisive behavior and the hostility created in the office environment" and that she explained this reason to Savell. (Roy Aff. ¶¶ 7-8, Doc. No. 21-25.) Savell testified at his deposition that he went to speak with Roy when he learned of her resignation and that Roy did not give a reason to him, but responded affirmatively to him when he asked whether she would take back her resignation if he took care "of the issue that we both know exists in this area." (DSMF ¶ 48; POSMF ¶ 48.) Trafton admits that Roy tendered her resignation at the end of February or early in March of 2006. (POSMF ¶ 46). However, Trafton denies that she was rude and divisive or created hostility. (Id.) She supports this statement with affidavits from two women who worked with her at Sunbury, including the then practice coordinator and the then front desk receptionist. Both testified that Trafton was competent, professional, and fair, and that the issues that arose between Trafton and Wood were generated by patients calling the front office to complain about Sunbury's performance of services related to the back office. (Mallone Decl., Doc. No. 37; Gordon Decl., Doc. No. 38.)

According to Sunbury, Savell decided to fire Trafton in order to keep Roy on staff. (DSMF ¶ 46.) Roy worked at Bangor Family Medicine as a Medical Assistant under Brenda Wood and eventually became Bangor Family Medicine's Clinical Coordinator in 2006 after Wood transferred to Orono Family Medicine. (Id. ¶¶ 46, 56.) Roy was the only medical assistant assigned to Bangor Family Medicine, though Wood could also perform those duties. (Statement ¶ 47; Pl.'s Opposing Statement ¶ 47; Wood Dep. at 48.) According to Savell, he decided that Trafton was unable to build a cooperative relationship between the clinical department and the front office and concluded that he would terminate her for this reason.

(DSMF ¶ 49; Savell Dep. at 47.) As between Roy and Wood, Savell testified that he concluded that Roy was the more important employee to retain. (DSMF ¶ 50; Savell Dep. at 71.) In its submission to the Maine Human Rights Commission, Sunbury articulated this same reason for terminating Trafton. (Sunbury's Response to Request for Information and Documents at 1, ¶ 1, Doc. No. 34-4.) Trafton asserts that Sunbury gave a different justification to the MHRC, citing paragraph 15 on page 5 of the submission, but that paragraph cross references paragraph 1, which is entirely consistent with the justification that Sunbury offers in this litigation. However, in paragraph 15 of the submission, Sunbury asserted that Savell felt from an earlier date that Trafton was the wrong person for the job and that she lacked the people and leadership skills needed to effectuate a smooth transfer to Bangor and smooth launch of the new practice, but that Roy's resignation "forced Savell's hand." (See PSAMF ¶ 73.) Trafton also asserts that Sunbury gave a conflicting explanation to the Maine Unemployment Insurance Commission because Barbara Mann, Sunbury's HR Manager, listed the reason for Trafton's separation as "performance problems" but testified at her deposition that Savell told her, in a meeting prior to Trafton's termination, that Trafton was a "bad fit." (Id.)

On March 6, 2006, Trafton was called to a meeting in Savell's office, also attended by Barbara Mann. Savell informed Trafton that her employment was terminated. (PSAMF ¶ 66.) According to Trafton, Savell told her, "I just think this job emotionally is too much for you." Trafton also maintains that Savell made reference to her "breakdowns" and stated that he felt she was not "emotionally healthy." (Id. ¶ 57.)

Earlier on the day of her termination, Trafton had e-mailed Brenda Deraps, Hampden Family Medicine's Clinical Coordinator, to request that Dr. Trimble prescribe additional medication for Trafton's work-related anxiety. (Id. ¶ 62; March 6, 2006 e-mail, Doc. No. 21-31;

9

DSMF ¶ 52.) Trafton declares that she received not one, but two, e-mail notifications that the message was received and opened. (Id. ¶ 63.)

Months after Trafton's termination, in August of 2006, Wood transferred from Bangor Family Medicine to Orono Family Practice into a position as Medical Assistant, a position with $1.00 per hour lesser pay. (PSAMF ¶ 25.) Trafton describes this transition as a demotion. However, the record reflects that Wood only filled that position for less than a month before assuming the Clinical Coordinator position for Orono Family Practice on September 11, 2006, after the existing Clinical Coordinator retired. (Def.'s Reply Statement ¶ 25.) Meanwhile, Sunbury promoted Ms. Roy to the position of Clinical Coordinator for Bangor Family Medicine after Wood transferred to the Orono practice. (DSMF ¶ 56.)

Sunbury (and Savell) deny that Savell knew, while Trafton was an employee, that Trafton had ever been diagnosed with a mental health condition or had ever attempted suicide. (DSMF ¶¶ 67-68.) Trafton herself never told Savell and neither did Dr. Trimble. (Id. ¶¶ 62-63.) Instead, Trafton relies on a combination of circumstantial evidence consisting of the comments that she says Savell made to her, combined with the accessibility of her medical information and history due to her treatment with Dr. Trimble, a Sunbury physician, and evidence of scarring on her left forearm from past suicide attempts. Trafton's deposition testimony and declaration establish that she bears visible scars from cutting her wrists. Trafton describes these scars as numerous, highly visible scars on her left forearm from past attempts to take her own life. (PSAMF ¶ 39.) According to Trafton, she often would push up her sleeves or wear short sleeves while at work and in the presence of David Savell. (Id. ¶ 51.) Savell denies ever noticing any scars on Trafton's forearm. (DSMF ¶ 69.)

10

According to Dr. Trimble, she had "serious reservations about noting [Trafton's] work stress and depression in her medical record as I suspected the privacy of employees' medical records within the Sunbury Primary Care/Hampden Family Medicine office was not scrupulously maintained." (PSAMF ¶ 45; Trimble Decl. ¶¶ 6.) Dr. Trimble did, however, record information about Trafton's stress and depression in the notes of her visits with Trafton. (PSAMF ¶ 41.) To explain her concern over confidentiality, Dr. Trimble reports that Barbara Mann once told Dr. Trimble that she knows what employees take for medication. (Id. ¶ 46.) Mann acknowledged at her deposition that she receives reports from the administrator of Sunbury's self-insured employee health plan that disclose the medications being taken by employees. (Id. ¶¶ 47-48; Mann Dep. at 49-51, Doc. No. 21-26.) Mann receives the reports "on a monthly basis, after the fact." (Mann Dep. at 51:2-7.) Dr. Trimble testified at her deposition that "information in general" tends to flow from Mann to Savell and from Deraps to Savell. (PSAMF ¶ 49.) Savell had access to medical files at the Hampden location, which files were stored in unlocked shelves and cabinets, though his own office was in Bangor. (Id. ¶ 52; DSMF ¶¶ 70-72.)[5]

After her termination from Sunbury in 2006, Trafton "went into a pretty deep depression." It took three or four weeks before she started looking for work. (DSMF ¶¶ 123;

---

[5] I sustain a hearsay objection related to a conversation that Trafton once had with a friend and co-worker, Lynn Willard, about something allegedly stated by another Sunbury employee, Roberta Klimaszewski. (See DSMF ¶ 67; POSMF ¶ 67; PSAMF ¶ 50; Def.'s Reply Statement ¶ 67, ¶ 50 (additional); Pl.'s Reply to Objections ¶ 67.) Willard is said to have told Trafton that Klimaszewski told Willard that Klimaszewski told Savell that Trafton had attempted suicide in 2004. (See Trafton Dep. at 220, 223-225.) Trafton argues that it is an admission under Rule 801(d)(2)(D), but fails to provide the foundation needed to establish that Willard's statement to her and Klimaszewski's statement to Willard were made in the scope of their employment with Sunbury. Klimaszewski has executed an affidavit stating that she never spoke with Savell about the scars on Trafton's wrist or about her mental health history, including any prior suicide attempt. (DSMF ¶ 66; Klimaszewski Decl. ¶ 8, Doc. No. 21-28.) Willard has not supplied a sworn statement or any testimony concerning the matter; at least none referenced in the summary judgment record. Parenthetically, Trafton's own testimony on this issue is more in the nature of explaining a theory rather than divulging a fact. (Trafton Dep. at 220:16-20, 223:9-17, 224:1-7.)

Pl.'s Opposing Statement ¶ 123.) By fall of 2006 she was back in school at Eastern Maine Community College and it is undisputed that she performs very well in that academic environment. (DSMF ¶¶ 116-122.)

Previously, Trafton had worked for Sunbury Primary Care for the period 2001 through November 2002. At that time, Trafton was the office coordinator for Brewer Family Medicine and reported to Dr. Ken Simone. In 2002, Trafton left a suicide note at Brewer Family Medicine, though she did not actually attempt suicide.[6] Dr. Simone received this letter but there is no indication that Dr. Simone ever related this event to Savell, who was not employed with Sunbury at the time. (PSAMF ¶ 2; Trafton Dep. at 218-19.)

### III. Summary Judgment Discussion

Trafton filed her complaint in the Maine Superior Court on February 29, 2008, alleging a solitary count of disability discrimination under the Maine Human Rights Act. In September of 2008, Trafton sought leave to amend her complaint to add a second count arising under the Americans with Disabilities Act, whereupon Sunbury removed the case to this Court based on the existence of a federal question. (Notice of Removal, Doc. No. 1; Am. Compl., Doc. No. 1-18.) Because Sunbury is a Maine entity, the ADA count is the exclusive basis for federal jurisdiction.

The standard for stating a claim under the ADA and the MHRA for disability discrimination is stated in the same language. A claim of disability discrimination under the ADA require the plaintiff to establish "(1) she was disabled within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, either with or without reasonable

---

[6] I have sustained an objection related to whether Dr. Simone "may have told" Savell anything about the suicide note Trafton wrote in 2002 because the record citation does not support a non-speculative finding. (Pl.'s Opposing Statement ¶ 67, citing Trafton Dep. at 219:8-16.)

accommodations, and (3) her employer took adverse action against her because of her disability." Sanchez-Figueroa v. Banco Popular, 527 F.3d 209, 213 (1st Cir. 2008).  Similarly, a claim under the MHRA requires the plaintiff to establish that "first, she suffers from a disability;  second, she is otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job;  and third, she was adversely treated by the employer based in whole or in part on her disability."  Doyle v.  Dep't of Human Servs., 2003 ME 61, ¶ 14, 824 A.2d 48, 54;  accord  Whitney v.  Wal-Mart Stores, Inc., 2006 ME ¶ 9;  895 A.2d 309, 312.  Sunbury challenges whether Trafton has sufficient evidence to justify a finding in her favor on the first and the third elements of these standards.  (Mot. for Summary J. Mem. at 1.)  I conclude that Trafton fails to demonstrate that she qualifies as disabled for purposes of the ADA and that she fails to adduce sufficient evidence that she was terminated because Savell perceived her as someone with a disability under the ADA or a history of such a disability.  Because the standard for liability under the MHRA is appreciably lower, I recommend that the Court enter summary judgment exclusively on the federal claim and remand the state claim for further proceedings.

     A.     The ADA Claim

As for the first element, qualifying as disabled, at the time of Trafton's employment and termination, what it meant to be disabled under the ADA was different from what it meant to be disabled under the MHRA.  Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." Rivera-Garcia v. Sistema Universitario Ana G. Mendez, 442 F.3d 3, 5 (1st Cir. 2006) (quoting 42 U.S.C. § 12102(2)(A)).  Essential to this standard is the need to identify at least one major life activity and demonstrate that the plaintiff's ability to engage in that activity is substantially limited due to the impairment at issue.  Calero-Cerezo v. United States DOJ, 355 F.3d 6, 20-22 (1st Cir. 2004)

(recognizing that someone with major depression can qualify as disabled under the ADA, depending on the circumstances, but merely assuming that the named plaintiff qualified based on the defendant's failure to argue otherwise). Trafton argues that Savell regarded her as substantially limited in the major life activities of working and caring for oneself. (Opposition Mem. at 12-13.) To be substantially limited in one's ability to work, the individual must be unable to perform "a broad class of jobs." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197 (2002); Quiles-Quiles v. Henderson, 439 F.3d 1, 5-6 (1st Cir. 2006) (citing Sullivan v. Neiman Marcus Group, Inc., 358 F.3d 110, 117 (1st Cir. 1999)). A view that the employee is not suited for a particular job does not suffice. As for caring for oneself, it has been held that "mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself," Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 168 (2d Cir. 2003), and it is this aspect of her history, including related hospitalizations, that Trafton relies on to satisfy her burden of persuasion (Opposition Mem. at 13), although she does not contend that she was suicidal or otherwise disabled under the ADA at any time during her employment with Sunbury (id. at 9-13).

Under both the ADA and the MHRA, a plaintiff may establish that she qualifies for protection not only if she demonstrates the existence of a qualifying disability, but also if she can demonstrate that she had a record of a qualifying disability or was regarded by the employer as someone with a qualifying disability. 42 U.S.C. § 12102(2) (2000)[7]; 5 M.R.S. § 4553(7-B) (2002).[8] For purposes of the ADA, Trafton does not attempt to demonstrate that she was substantially limited in respect to a major life activity during her employment with Sunbury.

---

[7] This provision of federal law is now codified at 42 U.S.C. § 12102(1) (Supp. 2009).

[8] This provision of Maine law is now codified at 5 M.R.S. § 4553-A(1)(C), (D) (Supp. 2008).

Instead, she argues that she qualifies under the ADA because she has a record of a substantially limiting mental impairment and because she was regarded as having such an impairment. (Opposition Mem. at 10-13.) For purposes of the MHRA, on the other hand, she argues that she qualifies as disabled under all three categories. (Id. at 13-15.)

As Sunbury points out, the trouble with Trafton's attempt to fit into any one of these categories is that there is no solid and reliable evidence that Savell knew that Trafton's emotional behavior was associated with an underlying mental impairment that substantially restricted her ability to engage in a major life activity. (Reply Mem. at 2, Doc. No. 51.) Trafton and Dr. Trimble both deny ever giving notice to Savell of any underlying findings of PTSD, major depressive disorder, or suicide attempts and it is not a casual thing to presume that Savell or Mann would have reviewed Dr. Trimble's treatment records even if it came to Mann's attention that Wellbutrin and Ambien prescriptions were covered for Trafton under Sunbury's benefit plan. Nor is it a reasonable thing to presume that an employer would regard an employee as substantially limited in a major life activity based merely on such prescriptions. Without question, it is *conceivable* that a supervisor in a medical practice might investigate patient records kept by doctors or other providers in the practice, but summary judgment is about reasonable inferences and evidence supporting a probable finding. Trafton's own statement is drawn in speculative terms, as Sunbury points out. (Reply Mem. at 3, citing Pl.'s Opposing Statement ¶ 66: "Either Savell accessed Trafton's records, which were available to him and whose privacy was not maintained, or someone told him about Trafton's medical history.") As for the secondary possibility that Trafton raises, that someone may have told Savell about Trafton's personal history, Trafton has presented only her own hearsay statement about another hearsay statement, without laying any foundation to take the statements out of the hearsay rule.

15

Once again, Trafton asserts a conceivable scenario that word of past suicide attempts could have reached Savell, but acceptance of that scenario requires an inferential finding based on conjecture. Trafton says there is more circumstantial evidence because she bears the physical scars of her suicide attempts and Savell must have noticed them. However, in comparison, when she explains how Ms. Willard knew of her history, it is based on Trafton having told her in the context of a personal friendship. The point is that the circumstantial evidence that Trafton relies on to demonstrate Savell's knowledge of past suicide attempts or past mental health diagnoses is tenuous and conjectural even if it is conceivable. Trafton is entitled to have reasonable inferences drawn in her behalf, but she is not entitled to speculative inferences.

I conclude that the record adduced by Trafton is minimally sufficient to make it a fair inference that Savell, via Mann, came to understand that Trafton was taking Wellbutrin and Ambien. However, it is not a reliable inference to draw that Savell or Mann reviewed Dr. Trimble's treatment notes or whatever other medical records may have existed in Trafton's medical file prior to her termination. On this record, it would require speculation to determine that Savell had knowledge of Trafton's mental health history, including her prior suicide attempts. For purposes of the ADA, without a reliable basis to find that Savell more likely than not perceived Trafton as a suicide risk or as someone with a significant past mental health diagnosis, such as PTSD, the record is insufficient to demonstrate that Trafton qualifies as disabled under the ADA. I therefore recommend that the Court grant Sunbury's motion for summary judgment as to Trafton's claim under the Americans with Disabilities Act.

### C. The MHRA Claim

In 2006, the definition of disability under the MHRA was broader than the definition of disability under the ADA. Whitney v. Wal-Mart Stores, Inc., 2006 ME 37, ¶¶ 18 & 21, 895 A.2d

309, 313-14 (Me. 2006) (holding that the MHRA rejects the "substantially limits qualification"). Circa 2006, there were "three categories of covered conditions": (1) "disability, infirmity, malformation, disfigurement, congenital defect or mental condition caused by bodily injury, accident, disease, birth defect, environmental conditions or illness"; (2) "the physical or mental condition of a person that constitutes a substantial disability as determined by a physician or, in the case of mental disability, by a psychiatrist or psychologist"; and (3) "any other health or sensory impairment that requires special education, vocational rehabilitation or related services." Id., 2006 ME 37, ¶ 24, 895 A.2d at 315. The first category outlined in Whitney includes mental conditions arising from environmental factors, which theoretically could extend to conditions necessitating medication, even if the plaintiff cannot reliably demonstrate that the employer was aware of a discrete diagnosis that would implicate the second category. Arguably, an awareness of depression and anxiety medications, a denied request for anxiety-related leave with a comment that the request demonstrated weakness, and comments critical of an employee's emotional response to stressors in the workplace might be enough under the lower standards of the MHRA to demonstrate that Sunbury regarded Trafton as having a "condition" that would qualify as a disability within the meaning of that Act. Consequently, I recommend that the Court remand the MHRA claim for further proceedings in the Superior Court.[9]

## CONCLUSION

---

[9] More recent legislation by Congress and the Maine Legislature may bring the ADA definition and the MHRA definition more in line with each other, but they do not apply to Trafton's case. Compare 42 U.S.C. §§ 12101 note (Supp. 2009) & 12102(4) (Supp. 2009) with 5 M.R.S. § 4553-A (Supp. 2008). See also Richardson v. Honda Mfg. of Al., LLC, ___ F. Supp. 2d ___, No. 1:07-CV-2038-VEH, 2009 WL 2171113, *6-8, 2009 U.S. Dist. Lexis 64039, *21-26 (N.D. Ala. July 22, 2009) (concluding that the recent Americans with Disabilities Amendments Act (ADAAA) does not apply retroactively, relying on Rivers v. Roadway Express, 511 U.S. 298, 311-13 nn.11 & 12 (1994)).

For reasons set out above, I RECOMMEND that the Court GRANT, IN PART, Defendant's Motion for Summary Judgment (Doc. No. 19) by entering judgment for the Defendant on the ADA claim and remanding the MHRA claim to the state court. I withhold ruling on Defendant's Motion to Exclude the Expert Testimony of Adam Lauer, D.O., and Jennifer Trimble, D.O. (Doc. No. 17) and Defendant's Motion to Exclude the Expert Testimony of Eileen G. Kalikow (Doc. No. 18) pending the Court's review of the summary judgment recommendation.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

September 15, 2009