UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DARLENE TRAFTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-08-322-B-W |
| | ) | |
| SUNBURY PRIMARY CARE, P.A., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER REJECTING THE RECOMMENDED DECISION
OF THE MAGISTRATE JUDGE**

The Court concludes that there is sufficient evidence in the record to withstand summary judgment in this employment discrimination action, and therefore rejects the Magistrate Judge's Recommended Decision and denies the employer's motion for summary judgment.

**I.      STATEMENT OF FACTS**

**A.      Procedural History**

Darlene Trafton[1] brings this action against her former employer, Sunbury Primary Care, P.A. (Sunbury), alleging unlawful discrimination on the basis of a disability in violation of the Maine Human Rights Act (MHRA) and the Americans with Disability Act (ADA).  Before the Court is the Defendant's Motion for Summary Judgment, which the Court referred to the Magistrate Judge for recommended decision.  On September 15, 2009, the Magistrate Judge filed her Recommended Decision in which she recommend that the Court grant summary judgment on Ms. Trafton's ADA claim, and remand her MHRA claim to the state court. *Rec. Dec.* at 18 (Docket # 60) (*Rec. Dec.*).  On October 2, 2009, the Defendant and Plaintiff filed objections to

---

[1] During her employment with Sunbury, Ms. Trafton went by the name Darlene Atwater.  *Pl.'s Statement of Material Facts* ¶ 1 (Docket # 34) (*Pl.'s SMF*).  Occasionally documents in the record reference Darlene Atwater and to avoid confusion, the Court has altered them to refer to Ms. Trafton.

the Recommended Decision.  *Pl.'s Ob. to Rec. Dec. on Mot. for Summ. J.* (Docket # 61) (*Pl.'s Ob.*), *Def.'s Ob. and Request for Review of Rec. Dec. on Def.'s Mot. for Summ. J. and Request for Oral Argument* (Docket # 62) (*Def.'s Ob.*).  On October 22, 2009, the parties filed responses to these objections.  *Pl.'s Reply to Def.'s Ob. to and Request for Review of Rec. Dec. on Def.'s Mot. for Summ. J. and Request for Oral Argument* (Docket # 63) (*Pl.'s Reply*), *Def.'s Reply to Pl.'s Ob. to Request for Review of Rec. Dec. on Def.'s Mot. for Summ. J.* (Docket # 65) (*Def.'s Reply*).  On February 19, 2010, upon Sunbury's motion, the Court held oral argument.  Because the Court concludes that Ms. Trafton has demonstrated that she is disabled under the ADA and that there is a genuine issue of material fact as to whether she was terminated because of this disability, the Court rejects the Magistrate Judge's recommendation.

### B.    Factual Background

Drawn in the light most flattering to Ms. Trafton, *Bergeron v. Cabral*, 560 F.3d 1, 4 (1st Cir. 2009), the summary judgment record includes the following facts.[2]

#### 1.    Ms. Trafton's Mental Impairment

Darlene Trafton first began to suffer from depression when she was thirteen years old. *Def.'s Statement of Material Facts* ¶ 75 (*Def.'s SMF*); *Pl.'s Reply to Def.'s Statement of Material Facts* ¶ 75 (*Pl.'s Reply to Def.'s SMF*).  Ms. Trafton attributes the onset of her mental condition and her effort in her early teens to cut her wrist with a shaving razor to witnessing domestic violence by her stepfather against her mother.  *Def.'s SMF* ¶ 76; *Pl.'s Reply to Def.'s SMF* ¶ 76.

In 1993, when she was approximately twenty-five, Ms. Trafton was the victim of a date rape.  *Pl.'s Statement of Material Facts* ¶ 29 (Docket # 34) (*Pl.'s SMF*).  Ms. Trafton was first

---

[2] The Court has not reiterated all the details of the case which are fully set forth in the Magistrate Judge's Recommended Decision, *Rec. Dec.* at 3-12, but provides the following facts for background and to highlight the evidence set forth by Ms. Trafton.

diagnosed with depression and post-traumatic stress disorder (PTSD) after the sexual assault. *Pl.'s SMF* ¶ 29. She twice attempted suicide; in 1993 after the sexual assault and in 2004. *Id.* ¶¶ 31, 38. After the sexual assault, Ms. Trafton experienced violent nightmares and would sleep in the bathtub with a gun, and Ms. Trafton was hospitalized for depression. *Id.* ¶¶ 31, 39.

From January 1998 through December 1998, Ms. Trafton was in counseling with Mary White, L.P.C., who assessed her level of functioning as poor and indicative of severe depression. *Id.* ¶ 32. During that time, Ms. Trafton was also treating with Dr. Marta Rieman; Dr. Rieman's office note of January 19, 1998 indicates that Ms. Trafton was experiencing decreased energy, anorexia, difficulty sleeping, early morning awakening, and feelings of hopelessness and worthlessness. *Id.* ¶ 33. In 2002, Ms. Trafton was extremely depressed and left a suicide note with her employer, who contacted Dr. Rieman and the police. *Id.* ¶ 34. Dr. Rieman was extremely concerned about Ms. Trafton's safety during that time. *Id.* ¶ 35. For example, in July, 2002, Dr. Rieman spoke with Ms. Trafton on July 3, 4, 5, 6, 8, and 16, and gave Ms. Trafton her contact information while the doctor was vacationing in Hawaii. *Id.* ¶ 36.

On October 22, 2004, Ms. Trafton attempted suicide a second time, and she was hospitalized at Acadia Hospital on October 25, 2004. *Id.* ¶ 37. Ms. Trafton's evaluation/admission history at Acadia Hospital states that Ms. Trafton had thought of suicide on a daily basis for the previous three months, and had experienced escalating severity of depression for the preceding three weeks, culminating with the suicide attempt. *Id.* ¶ 38. Before her admission to Acadia, Ms. Trafton had a minimal appetite, was not sleeping, and was having decreased ability concentrating. *Id.*

Between January 6 and March 6, 2006, while employed with Sunbury, Ms. Trafton was treated by Dr. Jennifer Trimble, a Sunbury physician practicing at the Hampden Family

Medicine office.  *Id.* ¶ 40.  Dr. Trimble documented Ms. Trafton's history of major depression, PTSD, and attempted suicide.  *Id.* ¶ 41.  On January 6, 2006, Dr. Trimble diagnosed Ms. Trafton with insomnia and fatigue, likely secondary to major depression, prescribed Wellbutrin to Ms. Trafton, and recommended that she take some time off from work.  *Id.* ¶¶ 42, 58.  Dr. Trimble saw Ms. Trafton three more times, and when she saw Ms. Trafton on February 7 and 27, she continued her Wellbutrin prescription and noted insomnia secondary to depression and fatigue. *Id.* ¶¶ 43, 44.

After her termination from Sunbury, Ms. Trafton switched providers to Dr. Adam Lauer. *Def.'s SMF* ¶ 87.  On October 19, 2006, Dr. Lauer saw Ms. Trafton for a lesion on her nose, but noted her depression and refilled Ms. Trafton's Wellbutrin prescription.  *Pl.'s Reply to DSMF* ¶ 88.  Dr. Lauer has been treating Ms. Trafton for depression and anxiety and managing her medications.  *Def.'s SMF* ¶ 92; *Pl.'s Reply to DSMF* ¶ 92.

## 2.  Ms. Trafton's History at Sunbury:  An Overview

On October 28, 2005, Darlene Trafton began working for Sunbury, an organization of healthcare providers consisting of seven separate family practice medical offices in the Bangor, Maine area, as its Front Office Manager.[3]  *Def.'s SMF* ¶¶ 5, 6; *Pl.'s SMF* ¶ 4.  She was supervised by David Savell, Sunbury's Chief Executive Officer.  *Def.'s SMF.* ¶ 8; *Pl.'s Reply to DSMF* ¶ 8.  Ms. Trafton's first task as Front Office Manager was to assist in the relocation of Sunbury's Office in Brewer, Riverview Family Medicine, to a temporary location in Hampden with another Sunbury division, Hampden Family Medicine, while the a new office building in Bangor was constructed.  *Pl.'s SMF* ¶ 5.  Once the Bangor facility was constructed, Riverview would move from Hampden to Bangor, and open as Bangor Family Medicine.  *Id.*  The move

---

[3] Ms. Trafton was also employed by Sunbury from April 2001 through November 2002, as the office coordinator for Brewer Family Medicine.  *Pl.'s SMF* ¶ 2.  It is only the period from October 2005 through March 2006 that is at issue in this case.

from Brewer to Hampden occurred on December 5, 2005, and the move from Hampden to Bangor occurred on January 5, 2006. *Id.* ¶¶ 12, 14. In addition to coordinating these moves, as Front Office Manager, Ms. Trafton coordinated work activities and schedules within the office, supervised and evaluated front office staff, greeted patients and visitors, checked patients in, updated their insurance information, helped maintain patient flow, organized patient charts, and scheduled patients. *Id.* ¶ 21.

The moves from Riverview to Hampden and then to Bangor were necessary because Dr. Gary Ross, formerly a shareholder and physician with Riverview, was under investigation by the Board of Registration of Medicine and had separated from Riverview. *Pl.'s SMF* ¶¶ 6-7. Mr. Savell told Ms. Trafton that because of the circumstances under which Dr. Ross was separated from Sunbury, the Riverview employees were angry and needed a leader who could keep them together and bring the workplace "to a better place" and that Ms. Trafton's role was to "hold the place together" and keep Riverview employees working as a cohesive unit throughout the two moves. *Pl.'s SMF* ¶¶ 8, 10.

Ms. Trafton found the process of moving the Riverview practice to Hampden to be stressful. *Def.'s SMF* ¶ 14; *Pl.'s Reply to DSMF* ¶ 14. She worked long hours and put in extraordinary effort to pack for, orchestrate, and execute the move from Riverview to Hampden. *Pl.'s SMF* ¶ 11. In an email dated December 5, 2005, Mr. Savell wrote in part:

> I thank . . . Darlene [Trafton] and Melanie True for planning and executing Riverview Family Medicine's move to Hampden Family Medicine facility, including the extra effort to ensure all patient records were relocated to Hampden so that patient flow could be re-established no later than eight o'clock on Friday, December 2, 2005 . . . Brenda Deraps, Darlene [Trafton], and Melanie True for establishing a game plan to accommodate the staff and patient move from Riverview Family Medicine to Hampden Family Medicine.

*Pl.'s SMF* ¶ 13.

During the one month that the Riverview division was sharing office space in Hampden, the Riverview division had only one clinical provider, Cathy Bouton-Semell, PA-C, and no clinical coordinator. *Pl.'s SMF* ¶¶ 14, 15. Mr. Savell asked Ms. Trafton to "keep an eye on" the clinical side of the Riverview practice. *Pl.'s SMF* ¶ 15. On December 16, 2005, Mr. Savell wrote to Ms. Trafton:

> [Y]ou are truly doing exactly what needs to be done. You will [definitely] achieve what needs to be achieved at Bangor Family Medicine . . . remember you are carrying a heavy load for ultimately the flagship division at Sunbury Primary Care. You do not need to feel that I think you have any ulterior motives, personal agendas, and [definitely] not a mean spirit. Please continue to say to me what you need to say so that you are comfortable and we can continue to work towards the same success.

*Pl.'s SMF* ¶ 26.

When the Riverview division moved to Bangor in early January, Physician's Assistant Bouton-Semell joined Dr. Michael Bruehl, who had transferred from a Sunbury division in Orono. *Pl.'s SMF* ¶ 17. After Bangor Family Medicine opened its doors on or about January 16, 2006, Ms. Trafton took on the more traditional functions of a Sunbury front office manager since Sunbury had hired Brenda Wood to act as its clinical coordinator and Ms. Wood had assumed responsibility for the back office or medical component of Bangor Family Medicine. *Pl.'s SMF* ¶ 19. Ms. Trafton and Ms. Wood were co-equals in terms of their levels of authority and supervisory capacity over their staff at Bangor Family Medicine. *Pl.'s SMF* ¶ 20. Ms. Wood reported to Dr. Bruehl and Mr. Savell, and Ms. Trafton to Mr. Savell alone. *Id.*

On February 24, 2006, Mr. Savell emailed Ms. Trafton, stating "Again, thank you for all that you have provided with respect to organizing and managing the front office area for Bangor Family Medicine." *Pl.'s SMF* ¶ 27. During her tenure at Sunbury, Ms. Trafton never received any criticism, warnings, or progressive discipline for her work performance. *Pl.'s SMF* ¶ 28. On

March 6, 2006, Mr. Savell called Ms. Trafton into his office and in the presence of Barbara Mann, Sunbury's Director of Human Resources, he terminated her employment. *Def.'s SMF ¶¶ 52-55.*

### 3. Issues During Ms. Trafton's Employment at Sunbury

During her employment at Sunbury, Ms. Trafton found it very difficult to work for Mr. Savell. *Def.'s SMF ¶ 21.*[4]  Ms. Trafton "teared up" on the job and estimated that from December 7, 2005 until her termination, she cried at work about six times or less. *Def.'s SMF ¶ 23; Pl.'s Reply to Def.'s SMF ¶ 23.*  One occasion took place on December 5, 2005, and happened when a fellow employee Barbara Klimaszewski criticized Riverview's readiness to make the move to Hampden.[5]  *Def.'s SMF ¶ 24; Pl.'s Reply to Def.'s SMF ¶ 24.*  A second tearing incident occurred when Mr. Savell visited Riverview before the move to Hampden, after he scolded Ms. Trafton when she went to help a patient during his meeting with staff. *Def.'s SMF ¶ 25.*  A third incident occurred when Ms. Trafton got "a little upset" after a physician's assistant looking for a scalpel, unpacked boxes that Ms. Trafton had packed for the move. *Def.'s SMF ¶ 26; Pl.'s Reply to Def.'s SMF ¶ 26.*

---

[4] Ms. Trafton posited a "qualified" admission to Sunbury's statement of material fact number 21, affirmatively stating: "I've dealt with a lot of difficult physicians, a lot of difficult bosses, but I've never had anybody treat me the way David did. So it was difficult and I would tear up.  And he would always refer to me being emotionally unstable." *Pl.'s Reply to Def.'s SMF ¶ 21.*  The Court does not perceive Ms. Trafton's response as denying that she found it difficult to work for Mr. Savell, but as offering an explanation for why she found it difficult to do so.

[5] Ms. Trafton interposed a long qualification to her admission to Sunbury's assertion that she teared up when Ms. Klimaszewski criticized her readiness to make the move to Hampden. *Pl.'s Reply to Def.'s SMF ¶ 24.*  She denied that she cried while she was talking to Mr. Savell and that her tears were prompted by Ms. Klimaszewski's criticism of her readiness to make the move. *Id.*  Instead, she said that Ms. Klimaszewski arrived at Riverview and called Mr. Savell to say that "nothing is going right." *Id.*  Ms. Trafton went on to say that "We had a great plan in place, things were being packed, we were on schedule.  We had a week shaved off our move and I still had everything situated where it needed to go.  I worked a considerable amount of hours to make sure it happened.  And then [Klimaszewski] comes in and gets on the phone and calls [my boss] and tells you (sic) that nothing is going right.  It's kind of a little upsetting when you are exhausted and things are going perfectly." *Id.*  The Court is not sure what the exact factual dispute is here. The bottom line is that Ms. Trafton cried while on the job apparently as a result of criticism to her boss from Ms. Klimaszewski that she perceived was unfair and unjustified.

At a December 7, 2005 meeting with Mr. Savell, he told Ms. Trafton that he thought the job was too much for her and she could not handle it because she was "unstable." *Pl.'s SMF* ¶ 54. At the end of another meeting, as Ms. Trafton was leaving, Mr. Savell said, "Now, don't go out and burn the building down."[6] *Pl.'s SMF* ¶ 54. Ms. Trafton was extremely bothered by this comment because it seemed to have no cause or rational context. *Def.'s SMF* ¶ 30; *Pl.'s Reply to Def.'s SMF* ¶ 30. Ms. Trafton asked Mr. Savell, "What does that mean?", and Mr. Savell replied, "Well, you do tend to get out of control." *Def.'s SMF* ¶ 31; *Pl.'s Reply to Def.'s SMF* ¶ 31. On February 13, 2006, Mr. Savell referred again to Ms. Trafton's "instability" and told her to "get [her] emotions under control." *Pl.'s SMF* ¶ 55. In February, Ms. Trafton had more than one conversation with Mr. Savell in which she told him to stop referring to her as unstable and to stop using the term, "breakdown," when referring to her. *Def.'s SMF* ¶ 35; *Pl.'s Reply to Def.'s SMF* ¶ 35. Ms. Trafton assumed that when Mr. Savell was using the term, "breakdown," he was referring to her past suicide attempts. *Def.'s SMF* ¶ 36. After she told him not to use these terms, Mr. Savell became uncommunicative and would not discuss work issues with her. *Pl.'s SMF* ¶ 61.

During her employment, Ms. Trafton, and two co-employees, Ms. Wood and medical assistant Lynette Roy, had some difficulties.[7] There was some disagreement between Ms. Wood and Ms. Trafton as to the appropriate boundaries between the front office and the clinical staff. *Def.'s SMF* ¶ 40; *Pl.'s Reply to Def.'s SMF* ¶ 40. Ms. Wood testified that she believed Ms.

---

[6] Mr. Savell has a much more benign recollection of his reference to burning the building down. Having just built a new medical office building, he recalls saying that it was not an option to burn the building down; he remembers the comment was not directed to Ms. Trafton. At this stage, the Court must accept Ms. Trafton's recollection.

[7] The parties disagree about the exact nature of the unhappiness. Ms. Trafton qualified most of her responses to Sunbury's Statement of Material Facts regarding the specifics about the relationship among the three of them. But, many of the qualifications seek to explain Ms. Trafton's view of conflict. Blame aside, the essential point seems to be that Ms. Trafton and Ms. Wood, and Ms. Trafton and Ms. Roy did not get along all that well.

Trafton sometimes interfered with the clinical aspect of Bangor Family Medicine.  *Def.'s SMF ¶* 44; *Pl.'s Reply to Def.'s SMF ¶* 44.

In late February or early March, Ms. Roy tendered her resignation from Sunbury.  *Def.'s SMF ¶* 46; *Pl.'s Reply to Def.'s SMF ¶* 46.  The parties dispute whether she resigned because of Ms. Trafton.  *Def.'s SMF ¶* 46; *Pl.'s Reply to Def.'s SMF ¶* 46.  To dissuade Ms. Roy from resigning, Mr. Savell testified that he told her, "If I take care of the issue that we both know exists in this area, will you take your resignation back?", and Ms. Roy agreed to do so.  *Def.'s SMF ¶* 48; *Pl.'s Reply SMF ¶* 48.  Mr. Savell testified that he decided to terminate Ms. Trafton because of her inability to build a cooperative relationship between her department and the clinical part of the practice.  *Def.'s SMF ¶* 49; *Pl.'s Reply to Def.'s SMF ¶* 49.

### 4.    Sunbury Terminates Ms. Trafton

During the latter part of the afternoon of March 6, 2006, Mr. Savell requested that Ms. Trafton come to his office, and he asked Barbara Mann, Director of Human Resources, to be present.  *Def.'s SMF ¶* 52.  Ms. Trafton walked into Mr. Savell's office with Ms. Mann and sat down.  *Def.'s SMF ¶* 53; *Pl.'s Reply to Def.'s SMF ¶* 53.  Shortly thereafter, Ms. Mann was called out of the office, and Ms. Trafton asked Mr. Savell, "Am I being fired?"  *Def.'s SMF ¶¶* 52, 53; *Pl.'s Resp. to Def.'s SMF ¶* 52, 53.  Mr. Savell told Ms. Trafton, "You've done a good job for the company, you got us where we needed to go, but you've run your course.  And I think this job is emotionally too much for you."  *Def.'s SMF ¶* 54; *Pl.'s Reply to Def.'s SMF ¶* 54.  Mr. Savell also told Ms. Trafton that she "did a good job moving us and getting us in the building" and she "provided [Mr. Savell] with a lot of good clinical information.  *Pl.'s SMF ¶* 57.  Ms. Trafton responded to her termination by telling Mr. Savell that she was going to get a lawyer,

and Mr. Savell responded, "No problem.  We are all set."  *Def.'s SMF* ¶ 55; *Pl.'s Reply to Def.'s SMF* ¶ 55.

## II.   DISCUSSION

### A.   The Americans with Disabilities Act

Absent direct evidence of discrimination, courts are directed to use the familiar burden-shifting paradigm outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in evaluating disability discrimination claims under the ADA.  *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999) (approving use of *McDonnell Douglas* framework in connection with ADA claims of disability discrimination). "To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove: (1) that she was "disabled" within the meaning of the ADA; (2) that she was able to perform the essential functions of her job with or without accommodation; and (3) that she was discharged or adversely affected, in whole or in part, because of her disability."[8]  *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 82 (1st Cir. 2008); *see also Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 111 (1st Cir. 2006).  If the plaintiff establishes her prima facie case, an inference of intentional discrimination is raised and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir. 2005).  Finally, if the defendant does so, the burden of production shifts back to the plaintiff, and she must proffer evidence to establish that the defendant's non-discriminatory justification is mere pretext, cloaking discriminatory animus. *McDonnell Douglas Corp.*, 411 U.S. at 804; *Ingram*, 414 F.3d at 230.  Should the plaintiff fail "to make it past the first stage, *i.e.,* to aver a

---

[8]  Only the first and third elements of Ms. Trafton's prima facie case are in dispute.

prima facie case, the inference of discrimination simply never arises and the employer's motion for summary judgment is granted."[9]  *Ingram*, 414 F.3d at 230.

### 1.      Disability Pointed to by Ms. Trafton

"For purposes of the ADA, one is considered disabled if she (a) has a physical or mental impairment that substantially limits one or more of her major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment." *Ruiz Rivera*, 521 F.3d at 82; *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002); *see also* 42 U.S.C. § 12102(1).  Ms. Trafton alleges a mental impairment that includes depression, anxiety, and PTSD. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 20 (1st Cir. 2004) (depression is a mental impairment that may in some circumstances constitute a disability under federal law); *Equal Employment Opportunity Comm'n v. Amego, Inc.*, 110 F.3d 135, 141 (1st Cir. 1997) (assuming for summary judgment purposes that plaintiff's depression and post-traumatic stress disorder rendered him "a disabled person within the meaning of the ADA").

Ms. Trafton's complaint does not rest on the first definition of disability—that is, she has not alleged that she had an actual disability at the time of her termination.[10]  *Pl.'s Ob.* at 8-9 (stating that "Trafton has demonstrated she satisfies the second and third prongs of the standard for purposes of the ADA").  Instead, she argues that she has a record of impairment, and that her employer, Sunbury, regarded her as having an impairment.  *Pl.'s Ob.* at 9-13.  To satisfy these

---

[9] At oral argument, Sunbury observed that in *Gross v. FBL Fin. Servs., Inc.*, the United States Supreme Court concluded that for ADEA claims, the plaintiffs must "establish that age was the 'but-for' cause of the employer's adverse action." 129 S. Ct. 2343, 2351 (2009); *Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 446 (1st Cir. 2009).  Sunbury presented *Serwatka v. Rockwell Automation, Inc.*, a Seventh Circuit case, that extended *Gross*'s "but for" analysis to ADA claims.  2010 U.S. App. LEXIS 948, at *9-10 (7th Cir. Jan. 15, 2010), and argued that the First Circuit could not be far behind in adopting this analytic construct for ADA claims.  Ms. Trafton disagreed, saying that at least for purposes of Maine law, the Maine Human Rights Commission has rejected the application of *Gross*'s "but for" analysis for Maine Human Rights disability discrimination claims.  The Court does not need to resolve this legal dispute to rule on the pending motion, since under either analysis, the result would be the same.

[10] Ms. Trafton admitted that "during her employment with Sunbury her PTSD and depression did not affect her work performance; Trafton was fully functional with respect to her ability to *work* at that time." *Pl.'s Reply to Def.'s SMF* ¶ 115.  Thus, she cannot demonstrate that at the time of her termination, she experienced a disability that substantially limited a major life activity.

two disability definitions, Ms. Trafton must demonstrate that her mental impairments substantially limited a major life activity. *Sullivan v. Neiman Marcus Group, Inc*. 358 F.3d 110, 114-115 (1st Cir. 2004); *see also* 42 U.S.C. § 12102(2)(A))

### a.     Ms. Trafton's Burden

For ADA purposes, the factors to be evaluated in assessing whether an individual is substantially limited in a major life activity include (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact, or the expected permanent or long-term impact, of or resulting from the impairment**.**   29 C.F.R. § 1630.2(j)(2).  Ms. Trafton bears a "substantial burden of proof" to demonstrate that a major life activity was substantially limited.  *Pimental v. Dartmouth-Hitchcock Clinic*, 236 F. Supp. 2d 177, 183 (D.N.H. 2002); *see also Bailey*, 306 F.3d at 1168 (1st Cir. 2002) (stating that plaintiff must make a "weighty showing" that impairment substantially interfered with the major life activity of working).  She must establish that her impairment "was profound enough and of sufficient duration . . . to hamper her ability" to engage in one or more major life activities. *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 258. F.3d 30, 33 (1st Cir. 2001).

### b.     Ms. Trafton's Evidence

Ms. Trafton alleges a condition of "major depression and PTSD, which is always present but at times acutely manifested."  *Pl.'s Ob*. at 10.  She maintains that the major life activities of "caring for herself [and] working" have been substantially limited by her mental health issues. *Id*.   In particular, Ms. Trafton argues that her two prior suicide attempts and resulting hospitalizations "[are] enough to establish that one or more of her major life activities (caring for herself, working) were impaired."[11]  *Id*.  To support her argument Ms. Trafton relies on her own

---

[11] The parties do not dispute that caring for oneself and working are "major life activities" for purposes of the ADA.

statements, the statements of Dr. Trimble and Dr. Lauer, and her medical records from 1998, 2001, 2002, 2004, and 2006.

### 2.     A Record of Impairment

Ms. Trafton contends she is entitled to the protection of the ADA under § 12102(2)(B), which defines a disability as having "a record" of disability under § 12102(2)(A). *Bailey*, 306 F.3d at 1169. The purpose of the "record of impairment" provision "is largely to protect those who have recovered or are recovering from substantially limiting impairments from discrimination based on their medical history." *See id.* (citing H.R. Rep. No. 101-485(II), at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 330, 334). "A record or history of an impairment is not sufficient to show disability; the record must be of an impairment [that] substantially limited a major life activity." *Bailey*, 306 F.3d at 1169.

The "record of impairment" upon which Ms. Trafton is relying is her history of two psychiatric admissions for attempted suicide. *Pl.'s Ob.* at 2 (stating that it "is patently obvious that an individual who has a documented history of past suicide attempts is substantially limited in the ability to care for herself and thus has a record of disability"). In support, Ms. Trafton relies on *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2nd Cir. 2003). In *Peters*, the Second Circuit wrote that "[a] mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself. It therefore constitutes a protected disability under the Rehabilitation Act." *Id.*

Ms. Trafton attempted suicide twice: once in 1993 and again in 2004. *Pl.'s SMF* ¶ 29. Both attempts resulted in hospital admissions. *Pl.'s SMF* ¶ 37, 38. When Ms. Trafton treated with Dr. Trimble, she revealed to Dr. Trimble her psychiatric history, including the two suicide attempts. *Pl.'s SMF* ¶ 40. During Ms. Trafton's employment with Sunbury, Mr. Savell made

remarks about Ms. Trafton's instability, her breakdowns, and her lack of emotional health. *Pl.'s SMF* ¶ 54, 55, 57. He once made an unusual comment after a meeting that Ms. Trafton should not "go out and burn the building down." *Pl.'s SMF* ¶ 54. He fired her because he thought the "job is emotionally too much for you." *Pl.'s SMF* ¶ 57.

To deflect summary judgment, however, Ms. Trafton must demonstrate that Sunbury was aware of her record of impairment, and that its knowledge of her record of impairment triggered her termination. *See Katz v. City Metal Co.*, 87 F.3d 26, 32-33 (1st Cir. 1996) (employer's knowledge of employee's disability supporting evidence for employee's ADA claim); *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897 (D.D.C. 1997) (stating "employer must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability"). Ms. Trafton never told Mr. Savell about her medical history, *Def.'s SMF* ¶ 61; *Pl.'s Reply to Def.'s SMF* ¶ 61, and in the Court's view, Mr. Savell's persistent comments alone, though consistent with his knowledge of Ms. Trafton's record of impairment, do not establish that he knew about her psychiatric admissions. The comments could as readily be his reaction to her emotional responses at work. However, in response to Sunbury's Statement of Material Facts, Ms. Trafton links knowledge of her psychiatric history to Sunbury. Sunbury's Statement of Material Fact paragraph 32 states:

> Plaintiff alleges that Mr. Savell told a Sunbury medical provider, Dr. Michael Bruehl, about her breakdowns.

*Def.'s SMF* ¶ 32. Ms. Trafton answered:

> Qualified. Plaintiff stated that Dr. Bruehl told her, "I heard about your two breakdowns." He related to Trafton that he had had a conversation with Savell in Savell's office during which Savell told Bruehl that Trafton had had breakdowns. Savell acknowledged to Trafton that this meeting had occurred.

14

*Pl.'s Reply to Def.'s SMF* ¶ 32.

Taken together, the Court views the evidence as sufficient to raise a triable question about whether Sunbury was aware of Ms. Trafton's psychiatric admissions and whether it terminated her because of her record of impairment. The clincher is Dr. Bruehl's reference to her "two breakdowns." In view of the fact that Ms. Trafton had had a number of emotional episodes at Sunbury, a factfinder could conclude that when Dr. Bruehl referred to Ms. Trafton's "two breakdowns," he must have been referring to her two suicide attempts and two psychiatric hospitalizations, and that he had obtained this information from Mr. Savell.[12] Thus, a factfinder could find that Mr. Savell was aware of her history of suicide attempts and psychiatric hospitalizations and that his persistent comments about her instability, her breakdowns, and her emotional fragility were based on his "misperceptions" about individuals who have a record of significant psychiatric illness and treatment.[13]

Sunbury responds that Ms. Trafton's record of impairment is insufficient as a matter of law to constitute a disability within the meaning of the ADA, because she manifested her psychiatric condition on only an occasional basis. *Def.'s Reply* at 3 (stating that "[t]o rise to the

---

[12] At oral argument, Sunbury urged a different view. It argued that Ms. Trafton had multiple breakdowns, not two, going back to her early teens, so that Dr. Bruehl's reference to "two breakdowns" could not have been directed to her two suicide attempts. Following oral argument, Sunbury filed a written submission directing the Court to specific citations from Ms. Trafton's deposition. *Correspondence Re: Record Citations following Oral Argument* (Docket #71). These citations recite portions of Ms. Trafton's deposition testimony, confirm that she never told Mr. Savell about her prior suicide attempts, establish that Dr. Bruehl never specified what he meant by the word breakdowns, and reference a lack of correlation between the psychiatric history contained in her medical record at Sunbury and the two prior suicide attempts. *Id.* They also highlight Ms. Trafton's awareness of tensions in the office between co-employees and herself. None of these citations, however, contradicts Ms. Trafton's statement that Dr. Bruehl told her, "I heard about your two breakdowns." *Pl.'s Reply to Def.'s SMF* ¶ 32.
From the Court's perspective, viewing Dr. Bruehl's reference to "two breakdowns" as referring to the two suicide attempts that led to psychiatric hospital admissions is consistent with viewing the evidence in the light most favorable to Mr. Trafton.

[13] In her Recommended Decision, the Magistrate Judge concluded that the evidence of Mr. Savell's knowledge of her psychiatric history was "tenuous and conjectural even if it is conceivable." *Rec. Dec.* at 16. The Court agrees with the Magistrate Judge that the evidence is circumstantial, but the coincidence between her two suicide attempts and psychiatric admissions and Dr. Bruehl's comment about her two breakdowns from the Court's perspective removes the case from the purely speculative and creates a genuine issue for a factfinder.

level of disability, the impact of an impairment must be permanent or long term"). In support, Sunbury cites *Calef v. Gillette Co.*, 322 F.3d 75 (1st Cir. 2003), *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12 (1st Cir. 1997), *Bilodeau v. Mega Indus.*, 50 F. Supp. 2d 27, 27 (D. Me. 1999), and *Wilcock v. Nat'l Distribs., Inc.*, No. 00-298-P-H, 2001 WL 877547 (D. Me. Aug. 2, 2001). The problem with this argument is that, again viewing the evidence in the light most favorable to Ms. Trafton, it was Sunbury that had perceived her record of psychiatric treatment as being long term and persistent, and as grounds for her termination.

From the Court's perspective, Ms. Trafton's record of two psychiatric admissions for attempted suicide, when coupled with Mr. Savell's comments about her mental instability and termination for emotional inadequacy, constitute, as the Second Circuit observed, a paradigmatic instance of the inability to care for oneself, and at least raise genuine issues of material fact. *Peters*, 320 F.3d at 168. In *Chandler v. Specialty Tires of Am. (Tenn.), Inc.*, 134 Fed. Appx. 921 (6th Cir. 2005), the Sixth Circuit reversed a district court's granting of summary judgment, where the employee had attempted suicide on one occasion, concluding that the employer "clearly formed stereotypical assumptions about [the employee's] ability to take care of herself and to perform her job on the basis of that suicide attempt." *Id.* at 926. *See Stokes v. The City of Montgomery*, No. 2:07cv686-WHA (WO), 2008 U.S. Dist. LEXIS 73889, at *16-17 (M.D. Al. Sept. 25, 2008) (concluding that an employee who was hospitalized after a suicide attempt had a record of impairment); *Tracy v. Fin. Ins. Mgmt. Corp.*, 458 F. Supp. 2d 734, 741 (S.D. Ind. 2006) (concluding that an employee who had obsessive compulsive disorder and had attempted suicide had raised a disputed fact as to whether she was disabled under the ADA).

It is true that Ms. Trafton did not attempt suicide while she was employed at Sunbury. But, the "record of impairment" prong protects both individuals who are recovering from mental

impairments, and those who have recovered. *Bailey*, 306 F.3d at 1169 (stating that the "purpose of this provision is largely to protect those who have recovered or are recovering from substantially limiting impairments from discrimination based on their medical history").

### 3.     Being Regarded as Having Such an Impairment

Ms. Trafton also claims that that she is disabled under the ADA because Sunbury regarded her as having a mental impairment which substantially limited her major life activities. *Pl.'s Ob*. at 11-14.  In support of her claim, Ms. Trafton says, that

> although Trafton's impairment was not substantially limiting at the time she worked for Sunbury, Savell's statements evidence that he regarded her as such. For instance, at various times Mr. Savell referred to her as "unstable," "weak," admonished her not to "go out and burn the building down," and discussed her "meltdowns" or "breakdowns."

*Id*. at 12.

### a.     *Sutton* and *Murphy*

The Supreme Court held that to be "regarded as disabled," the plaintiff must show that "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."[14]  *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999).  "In both cases, it is necessary that a covered entity entertain misperceptions about the individual - - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  *Id*.  *Sutton*

---

[14] In September 2008, Congress enacted the ADA Amendments Act effective January 1, 2009.  Pub. L. No. 110-325 (2008) (ADA AA).  Among other things, the ADA AA "rejects the United States Supreme Court's interpretation of the term disability in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 . . . (2002) and *Sutton* . . ., [527 U.S. at 492]."  *Colon-Fontanez v. Municipality of San Juan*, Civil No. 07-2142 (FAB), 2009 U.S. Dist. LEXIS 111865, at *60-61 n.36 (D.P.R. Dec. 2, 2009).  However, the amended provisions of the ADA AA are not retroactive. *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 34 n.3 (1st Cir. 2009).

explained that these misperceptions often "result from stereotypic assumptions not truly indicative of . . . individual ability." *Id.* at 490 (citing § 12101(7)).

Discussing the "regarded as disabled" definition of disability, *Sutton* observed:

By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria. An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment - - such as one's height, build, or singing voice - - are preferable to others, just as it is free to decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job.

*Id.* at 490-91. To fit within the definition of "substantially limiting" when the major life activity is working, a plaintiff must demonstrate that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* at 491 (citing 29 C.F.R. § 1630.2(j)(3)(i)).

*Sutton* cited the Equal Employment Opportunity Commission (EEOC)'s factors that a court should consider when determining whether an individual "is substantially limited in the major life activity of working, including the geographical area to which the individual has reasonable access, and 'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified.'" *Id.* at 491-92 (citing 29 C.F.R. §§ 1630.2(j)(3)(ii)(A),(B)). *Sutton* added:

To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Id.* at 492.

Shortly after *Sutton*, the United States Supreme Court decided *Murphy v. United Parcel Service*, 527 U.S. 516 (1999).  In *Murphy*, the Supreme Court emphasized that the inability to perform a particular job is "insufficient as a matter of law, to prove that petitioner is regarded as substantially limited in the major life activity of working."  *Id.* at 525.  The petitioner must demonstrate that she is "unable to perform a class of jobs."  *Id.*

### b.    Post-*Sutton-Murphy* Developments

Following *Sutton*, the First Circuit has applied its teaching that working can be a major life activity.  *Quiles-Quiles v. Henderson*, 439 F.3d 1, 5 n.2 (1st Cir. 2006).  In *Bailey*, the First Circuit further refined the analysis:

> A plaintiff claiming that he is "regarded" as disabled cannot merely show that his employer perceived him as *somehow* disabled; rather, he must prove that the employer regarded him as disabled *within the meaning of the ADA*.  Since Bailey contends that Georgia-Pacific perceived him to be substantially limited in the major life activity of working, he must show that he was perceived as being unable to work in either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities.

306 F.3d at 1169-70 (internal citation omitted).  Thus, in *Bailey*, the First Circuit concluded that the plaintiff's claim must fail, because his employer believed, at most, that he "was unable to meet the requirements of his particular job," not that "he was unfit for either a class or a broad range of jobs."  *Id.* at 1170.  Thus, summary judgment was appropriate.  *See Murphy v. United Parcel Serv. Inc.*, 527 U.S. 516 (1999); *Sullivan*, 358 F.3d at 117-18.  In *Sullivan*, the First Circuit conceded that "[t]he approach to the 'regarded as' prong that the Supreme Court took in *Murphy* has been subjected to a significant amount of academic criticism."[15]  358 F.3d at 118

---

[15] The First Circuit cited two law review articles:  a 2003 law review article by Claudia Center and Andrew J. Imparato, *Redefining "Disability" Discrimination: A Proposal to Restore Civil Rights Protections for All Workers*,

n.4.   Nevertheless, as the First Circuit pointed out, the Supreme Court "has not altered the *Murphy* precedent."  *Sullivan*, 358 F.3d at 118 n.4.

### c.    *Sutton-Murphy*, Sunbury, and Darlene Trafton

The *Sutton-Murphy* analytic construct makes it difficult to prove an "as regarded" claim. Applying *Sutton-Murphy*, again viewing the evidence in the light most favorable to Ms. Trafton, she has easily demonstrated that Sunbury fired her because they thought she "was unable to meet the requirements of [her] particular job."  *Bailey*, 306 F.3d at 1170.  In other words, the record establishes that Sunbury believed that Ms. Trafton had a disability – namely, a profound emotional fragility that prevented her from performing her job.

But, since not every impairment is a protected disability under the ADA, *Sutton-Murphy* require that the employee demonstrate that her disability substantially limits a life activity, in this case, working.  The Supreme Court stated in *Sutton* that "[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially

---

14 Stan. L. & Pol'y Rev. 321, 328 (2003) and a 2000 law review article by Professor Miranda Oshige McGowan, *Reconsidering the Americans With Disabilities Act*, 35 Ga. L. Rev. 27 (2000).   The Center and Imparato article sets forth the general standard for proving an "as regarded: claim:

> In cases relying upon the "regarded as" or third prong - the provision intended by Congress to ensure the broadest possible standard to combat myths and stereotypes - plaintiffs face an even more onerous challenge: Not only must they demonstrate the elusive "substantial limitation," but they must situate this construct in the theoretical mind of the employer.  In other words, to prevail on a third prong case, the plaintiff must show that her employer perceived her as substantially limited. The "class of jobs" regulation endorsed by the Sutton Court makes this difficult task virtually impossible.  In failure-to-hire cases, employers routinely convince courts that they only "regarded" the applicant as unable to perform a single job rather than an entire class of jobs (as required by the EEOC regulation) in order to avoid a finding that plaintiff was regarded as disabled. With the ADA thus judicially recast as a statute protecting only individuals with the most severe impairments, most workers facing discrimination can no longer obtain a federal remedy.

Center & Imparato, 14 Stan. L. & Pol'y Rev. at 328 (footnotes omitted).  As Professor McGowan mentioned, "[n]o employer evaluates an applicant's fitness to do some other employer's work.  Employers evaluate applicants for a particular job that needs to be filled, not the requirements for some other, hypothetical job."  McGowan, 35 Ga. L. Rev. at 123 (footnote omitted)..  Professor McGowan's point as regards applicants applies with even greater force to current employees.

limits one or more major life activities." *Sutton*, 527 U.S. at 489.  The "standards applicable to an actual disability apply equally in a perceived-disability case:  the question is whether, if the claimants had actually had the disabilities the employer regarded them as having, the claimants would have been significantly restricted in their ability to perform either a class of jobs or a broad range of jobs in various classes." *Equal Employment Opportunity Comm. v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1019 (7th Cir. 2001) (Wood, J. dissenting) (*EEOC*).  The question in the motion for summary judgment is whether Ms. Trafton "produced evidence in opposition to the motion that would have permitted a trier of fact to conclude that either a class or a broad range of jobs was so affected." *Id.*

One way for Ms. Trafton to meet her burden would be to produce evidence in "the form of quantitative vocational data addressing the number of alternative jobs in [Central Maine] (either within the same class or across classes) from which [Sunbury] regarded [Ms. Trafton] as disqualified." *Id.* at 1017.  Ms. Trafton has not produced such statistical or vocational expert testimony.  At the same time, evidence from a vocational expert, though often helpful, is "far from required." *Gelabert-Ladenheim v. Am. Airlines, Inc.*, 252 F.3d 54, 60 (1st Cir. 2001).

An alternative would be if Ms. Trafton's impairment is "so severe that [her] substantial foreclosure from the job market is obvious." *EEOC* at 1017.  In other words, whether it is permissible to draw an inference that Sunbury regarded Ms. Trafton as significantly restricted from entering the Central Maine employment market, because Sunbury perceived her as unable to perform a specific job at Sunbury.  The situations where courts have allowed "regarded as" claims to proceed based solely on the nature of the disability are more dramatic than Ms. Trafton's.  *See DePaoli v. Abbott Lab.*, 140 F.3d 668, 673 (7th Cir. 1998) (medical evidence of

21

plaintiff's inability to make any repetitive motions with her right hand sufficient to create triable issue on foreclosure from entire class of assembly line jobs).

Judge Wood described one approach in her dissent in *Rockwell*.[16]  Judge Wood urged the court to "look at the job skills that the employer demands for that job or jobs and determine how specific to the employer's own workplace they are.  In general, the more particular the job requirements, the more necessary it will be for a plaintiff to present demographic evidence that shows that those requirements are in fact found in enough jobs to matter for ADA purposes." *Rockwell*, 243 F.3d at 1020.  She noted that "[a] trier of fact can tell the difference between generalized criteria that will cut across a broad range of jobs, and specialized criteria that are employer- and workplace-specific, whether or not a vocational expert tells it how many thousands of jobs in the relevant geographic area have similar requirements.  It is also appropriate, in this context, to see how many jobs a particular employer thought were affected by the perceived disability: just one or two, or a broad range?" *Id.*

When the disability is a physical impairment, these judgments are more concrete.  It is easier to decide whether a lifting or walking restriction translates into an inability to perform a wider range of positions.   Here, however, Ms. Trafton's impairment is psychological and determining Sunbury's perception of her disability more tenuous.  Mr. Savell's stated reason for termination was that the job was "emotionally too much" for Ms. Trafton.  The termination was a culmination Mr. Savell's multiple comments about her "instability," telling her not to burn the building down, instructing her to get her emotions under control, and describing her as being susceptible to breakdown.  Further, because Ms. Trafton had tense relations with two employees, one of whom threatened to resign because of her, and because her termination followed Mr. Savell's promise to one of the employees to "take care of the issue," an inference can be drawn

---

[16] The First Circuit favorably cited Judge Wood's dissent in *Gelabert-Ladenheim*.  252 F.3d at 60.

that Sunbury perceived Ms. Trafton's disability as exhibiting an extreme emotional fragility, an inability to maintain a professional demeanor within the workplace, and a persistent difficulty getting along with her co-employees, and terminated her because of this disability.

Sunbury's perceptions of Ms. Trafton's impairment were not specific to the certain tasks within her job; instead, they went to her general ability to work within the office environment. In other words, Sunbury did not fire Ms. Trafton because she failed to properly organize the two Sunbury moves, because she failed to properly delegate or supervise employees, or because she lacked a computational skill.  Sunbury fired her because she became overtly emotional when chastised, because she exhibited psychological brittleness, and because she could not properly socialize and cooperate with co-workers.  It is not illogical to infer that these personal inadequacies would foreclose a broad range of jobs, or put another way, there is little to be gained by insisting that Ms. Trafton produce a vocational expert or a set of economic data to demonstrate that workers who weep when disciplined, over-react to stress, and fight with their co-workers will find it difficult to work in a broad range of office jobs.

Sunbury might properly wonder about all of this.  After all, it had an employee who – though competent in other respects – was weepy, over-reactive, and quarrelsome with co-workers at the workplace to the extent that one of its medical professionals had threatened to resign if she remained.  Even so, the record here suggests, though does not compel, the conclusion that Mr. Savell treated Ms. Trafton as a woman on the verge of a breakdown.  Mr. Savell's use of psychologically-laden language – instability, burn the building down, emotionally too much – suggests that he had concluded Ms. Trafton was not merely occasionally cantankerous or touchy, but that she was manifesting something more profound – namely, a psychological disability protected by the ADA.

This is not to predict what a factfinder would make of this unusual situation. But, the issue here is whether Ms. Trafton gets her day in court, and at this stage, the evidence must be viewed in the light most favorable to Ms. Trafton, not to Sunbury. By this Court's analysis, though her case is a close one, there is enough evidence in this record to allow her "as regarded" claim to proceed to a jury.

### 4. Legitimate Non-Discriminatory Reason for Termination

Having established her prima facie case of discrimination under the ADA, the burden shifts from Ms. Trafton to Sunbury to articulate a legitimate, non-discriminatory reason for Ms. Trafton's termination.[17] *McDonnell Douglas Corp.*, 411 U.S. at 802; *Ingram*, 414 F.3d at 230. Sunbury has put forth a legitimate reason for terminating Ms. Trafton, namely, Ms. Trafton's inability to get along with other employees, which led to the resignation of Ms. Roy. *Def.'s Ob.* at 16. Ms. Trafton concedes for purposes of summary judgment only that "Sunbury has articulated a legitimate reason for her termination—her divisive behavior [which] ultimately led another Sunbury employee to tender her resignation." *Pl.'s Opp'n to Def. Sunbury's Mot. for Summ. J.* at 19 (Docket # 33). Sunbury has satisfied its burden. *See McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 300 (1st Cir. 1998) (employer's testimony that it terminated plaintiff due to an acrimonious relationship with her co-workers sufficient to shift the burden to the plaintiff to show that the reason was a pretext).

### 5. Pretext

Ms. Trafton must now show that Sunbury's "proffered reason is a pretext for discrimination" and that the real reason for her termination is impermissible animus directed at her because of her mental impairments. *Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir.

---

[17] In *Velez*, the First Circuit observed that even applying *Gross*, "ADEA plaintiffs who do not have 'smoking gun' evidence may nonetheless prove their cases by using the three stage burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas*." *Velez*, 585 F.3d at 446-47 (citation omitted).

1998).  At the summary judgment stage, all Ms. Trafton must do is produce evidence "to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was [disability] discrimination." *Quinones v. Buick*, 436 F.3d 284, 290 (1st Cir. 2006) (quotation omitted).

One way a plaintiff can establish pretext is by showing weaknesses, inconsistencies and contradictions in the employer's proffered legitimate reasons for termination.  *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000); *see also Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) (stating "when a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual.")  Here, viewed in the light most favorable to Ms. Trafton, Sunbury has proffered various reasons for terminating her.  In its submission to the Maine Human Rights Commission, Sunbury stated that Ms. Trafton "lacked the skills necessary to smoothly transition herself and her staff from Riverview Family Medicine to Hampden Family Medicine . . . and thereafter to Bangor Family Medicine" as the reason for Ms. Trafton's termination.  *Pl.'s SMF* ¶¶ 72, 73.  However, Sunbury told the Unemployment Insurance Commission that Ms. Trafton was terminated because of "performance problems."  *Id.* ¶ 73.  Finally, Mr. Savell asserts that Ms. Trafton was terminated because of her divisive nature and ongoing feud with co-workers, and Sunbury's desire to retain Ms. Roy.[18]  *Def.'s SMF* ¶¶ 48, 50.

---

[18] At oral argument, Sunbury vigorously contended that the preferred reasons for termination are not inconsistent.  It says Ms. Trafton was fired because she could not get along with her co-workers, and that when one of the medical professionals threatened to resign if Ms. Trafton remained employed, Sunbury decided the value of retaining the medical professional exceeded the value of retaining Ms. Trafton.  Its references to lacking "skills," "performance problems," and her "divisive nature" all referenced her difficult relationship with her co-employees and in particular her feud with Ms. Roy.  This well presented argument may carry the day before a jury, but viewing these terms in the light most favorable to Ms. Trafton, they could as easily be conflicting: "skills" referring to her aptitude and training, "performance problems" referring to her inability to complete her assigned tasks, and her "divisive nature" referring to her lack of social skills.

Viewed in the light most favorable to Ms. Trafton, the legitimate reasons asserted by Sunbury not only are inconsistent, but are severely undermined by the fact that Ms. Trafton was a good worker and did a good job orchestrating Sunbury's moves from Brewer to Hampden and from Hampden to Bangor.  Ms. Trafton never received any criticism, warnings, or progressive discipline for her work performance.[19]  *Pl.'s SMF*. ¶ 28.  In December 16, 2005, when Sunbury was in transition between its Hampden and Bangor offices, Ms. Trafton received an email from Mr. Savell stating that she was "truly doing exactly what needs to be done.  You will [definitely] achieve what needs to be achieved at Bangor Family Medicine."  *Id*. ¶ 26.  After Sunbury moved into its Bangor office, Ms. Trafton continued to receive positive feedback from Mr. Savell on her job performance.  Just a few days before her termination, on February 28, 2006, Mr. Savell wrote "thank you for all that you have provided with respect to organizing and managing the front office area for Bangor Family Medicine."  *Id*. ¶ 27.  Even at her termination meeting, Mr. Savell had complimentary remarks for Ms. Trafton, stating that "[y]ou did a good job moving us and getting us in the building" and "you provided me with a lot of good clinical information."  *Id*. ¶ 57.  Mr. Savell never stated to Ms. Trafton that she was being terminated for her divisive behavior or in order to retain Ms. Roy.

Sunbury asserts that Ms. Trafton has offered "no competent evidence to refute Ms. Roy's resignation, the reasons for Ms. Roy's resignation, or Sunbury's rationale for choosing [Ms. Trafton's] termination in order to retain Ms. Roy."  *Def.'s Ob*. at 18.  When this case is presented to a jury, Sunbury's view may well carry the day; however, this evidence, when viewed in the light most favorable to Ms. Trafton, is offset by Sunbury's contradictory reasons for terminating Ms. Trafton, Mr. Savell's periodic comments about Ms. Trafton's mental state, and his

---

[19] Again, Sunbury argues that an expansive view of her personnel file, as broadly defined under Maine law, would disclose concerns about Ms. Trafton's performance.  Again, this seems to be a factual issue.  In any event, there was no progressive discipline prior to her termination.

complimentary emails to Ms. Trafton, the absence of documented evidence of poor job performance, Dr. Bruehl's express reference to the two breakdowns, and Mr. Savell's statement at her termination meeting that the "job was emotionally too much for [her]."   A jury could conclude that Sunbury's explanations for its termination of Ms. Trafton were false and discrimination due to her record of impairment and/or the fact Sunbury regarded her as being mentally impaired were the real reasons.  As such, Ms. Trafton has produced enough evidence to create a genuine issue of material fact appropriate for jury resolution.   Accordingly, Ms. Trafton's claim of unlawful discrimination under the ADA may proceed.[20]

## III.   CONCLUSION

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge (Docket # 60) is hereby REJECTED.  Defendant's Motion for Summary Judgment (Docket #19) is DENIED.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of February, 2010

---

[20] In her Recommended Decision, the Magistrate Judge recommended that Ms. Trafton's MHRA claim be remanded to the Superior Court.  *Rec. Dec.* at 17.  The Court continues to exercise supplemental jurisdiction over the MHRA claim pursuant to 28 U.C.S. § 1367.